[File No. 7105]

THE STATE OF NORTH DAKOTA, Respondent, v. REX BRACE, Appellant.

(36 NW2d 330)

Opinion filed January 28, 1949

*Roy K. Redetzke,* for Appellant.

*Nels G. Johnson,* Attorney General, *P. O. Sathre,* and *C. E. Brace,* Assistant Attorneys General, for Respondent.

MORRIS, J. This is an action by the State of North Dakota to obtain title by the exercise of the power of eminent domain, to certain lands almost surrounding an inland lake or pond known as Fuller's Lake. The land sought to be obtained by the state consists of eight tracts, the present title to which is in the defendant. The purpose for which the state seeks to obtain this land is to establish a Wildlife Refuge. As a basis for the necessity of exercising the power of eminent domain, the state alleges that it is the owner of the body of water known as Fuller's Lake. The territory surrounding this lake was surveyed by the United

States Government in 1872. At the time of the survey meander lines were run around the lake which shows that the area within the meander lines is about 170 acres. The surrounding lands to which the state seeks title embraces 179.41 acres and is a part of Section 12, Township 144 north, Range 55 west. The defendant is the owner of Section 12. The lake lies mostly within that section. A small portion of it which is not involved in this suit, extends westward beyond the line between Sections 11 and 12.

The defendant contends that as riparian owner of the surrounding land he is entitled to the land in Section 12 within the meander lines, and that his title extends to the center of the lake from every direction except that small portion extending west of the section line. He argues that Fuller's Lake is a non-navigable body of water and that the state, therefore, has no rights therein and no title to the land thereunder.

The case was tried to the court on questions of law, and to the jury on the question of the value of the land sought to be condemned. The jury rendered a verdict for $7.00 per acre, making a total sum of $1255.87. The court found that Fuller's Lake is a part of a natural water course to-wit, the south branch of Goose River and is a navigable lake and the state owns all of the bed of the lake lying within the meander lines fixed by the United States survey. He ordered that the defendant convey the premises sought by the state, upon tender and payment of the amount fixed by the jury. The defendant appeals.

The state's contention with respect to the ownership of the lake is set forth in the brief as follows: "The state claims title to the bottom or bed of Fuller's Lake on the ground that under the facts and applicable statutes it was and is a part of a natural water course, known as the North Branch of the Goose River, and a navigable lake when drained in 1909; that said lake was not lawfully drained and that the lake bottom did not become the property of riparian owners as accretion land."

The defendant derives title to the various tracts of his riparian lands through persons who received patents from the United States Government in 1884, 1890, 1901 and 1902. Thus a part of his title is derived from the patent issued prior to statehood and the balance from patents issued after statehood.

When North Dakota became a state it acquired title to lands under all navigable waters within its borders, subject to the limitation of the commerce clause of the federal constitution. State v. Loy, 74 ND 182, 20 NW(2d) 668. Admission to statehood vests no title in the state to lands underlying non-navigable bodies of water. Title to such lands remained in the federal government or in persons to whom it had transferred title. United States v. Oregon, 295 US 1, 79 L ed 1267, 55 S Ct 610. If before statehood the United States issued an unrestricted grant of land to riparian owners the patentee's title extended to the center of the adjacent non-navigable body of water. Brewer-Elliott Oil & Gas Co. v. United States, 260 US 77, 67 L ed 140, 43 S Ct 60; United States v. Holt State Bank, 270 US 49, 70 L ed 465, 46 S Ct 197; Oklahoma v. Texas, 258 US 574, 66 L ed 771, 42 S Ct 406. This rule is recognized by this court in Brignall v. Hannah, 34 ND 174, 157 NW 1042, and in Roberts v. Taylor, 47 ND 146, 181 NW 622.

In support of its claim the state cites paragraph 2 of Section 61–1501, RCND 1943, which provides, " 'A navigable lake' shall include any lake which shall have been meandered and its metes and bounds established by the government of the United States in the survey of public lands."
and Section 61–1502 which provides, "By virtue of its police power the state shall be vested with the control of navigable lakes which have been meandered and their metes and bounds established by the government of the United States in the survey of public lands, within the ordinary high water mark, . . . ."

These statutes came into our law in substantially their present form as a part of Chapter 229, SLND 1935. They do not purport to vest title to property in the state. Obviously they could not divest owners of their lands and transfer property to the state without the payment of due compensation under the exercise of the powers of eminent domain.

We are here dealing with titles vested by patents from the United States. Such titles cannot be affected by the declaration of navigability contained in Section 61–1501, RCND 1943. The legislature may not adopt a retroactive definition of navi-

gability which would destroy a title already vested under a federal grant, or transfer to the state a property right in a body of water or the bed thereof that had been previously acquired by a private owner. United States v. Champlin Refining Co. (CA 10th Okla) 156 F2d 769. A legislative declaration that all meandered lakes are navigable will not make them so if they are not navigable in fact, as against the pre-existing rights of riparian owners, unless compensation is made to such owners for the property thus injured or taken by the state. 56 Am Jur, Waters, Sec. 185. Thus we reach the conclusion that the state may not now successfully assert title, on the ground of navigability, to lands lying beneath non-navigable waters unless those waters were in fact navigable at the time of statehood in the absence of subsequent conveyances to the state. Where patents were issued to riparian owners prior to statehood rights thereunder with reference to navigable or non-navigable waters would be determined as of the date of the patent.

Meander lines are not per se boundary lines. Their purpose is to fix limits for the determination of the quantity of land to be paid for. They are not limitations on title. Brignall v. Hannah, 34 ND 174, 157 NW 1042, supra. St. Paul & P. R. Co. v. Schurmeir (US) 7 Wall 272, 19 L ed 74.

We now consider the evidence as to whether Fuller's Lake was a navigable body of water at the time the patents were issued if before statehood and at the time that North Dakota became a state if issued thereafter. The test is one of navigability in fact. Roberts v. Taylor, 47 ND 146, 181 NW 622, supra. The trial court determined that the lake was navigable and, that therefore the state was the owner of the land and water within the meander line. We now turn to the evidence regarding the question of navigability.

One witness came to the vicinity in 1882. He rowed a boat on the lake, some but not very much, while engaged in pleasure and hunting. He fixes the time at about 1908. Some places he could strike bottom with seven foot oars and some places he could not. He, together with another witness, cut ice on the lake in 1903, 1904, and 1905 which they sold in a nearby town.

He is corroborated with respect to both the cutting of the ice and the use of a boat by the other witness.

In 1909 a ditch was dug by means of a floating dredge connecting Fuller's Lake with the south branch of Goose River. Thereafter the water level in the lake was lowered to a considerable extent. During the drouth years of 1934 to 1936 the main body of water disappeared. The center of the lake became a marsh with the exception of a channel which was formed by the drainage ditch. A highway was later constructed along the section line extending eastward from the northeast corner of Section 12. A grade was filled in across a low marshy swale through which the drainage ditch had been dug. This resulted in filling in and blocking the ditch. Culverts were installed in the grade above the ground level and some distance above the bottom of the grade. This resulted in not only obstructing the flow of the drainage ditch but also to some extent the natural overflow of water out of Fuller's Lake across the lowland to the northeast. Subsequent rains filled up Fuller's Lake again so that it extended in most directions beyond the original meander line. This was its condition at time of trial. About one half of the present area of the lake is grown up with grass and aquatic plants. The other half being clear or open water. This area with the exception of the old drainage ditch is about three to four feet in depth. Several witnesses have hunted on the lake in recent years using flat bottom boats or rubber boots to get about. There is no evidence of the public using the lake for fishing, boating for pleasure, or swimming. This is accounted for by the fact that the edges of the lake are marshy, and the shallow water is infested with weeds and grass. Thus it appears that the only public attraction is the pursuit of wildfowl during the hunting season. The witness, Thompson, an engineer in the employ of the state, testified that the general course of drainage in that area was north to the south branch of the Goose River, and the outlet of Fuller's Lake flows into that branch. The Goose River empties into the Red River of the North. Thus the witness reached the conclusion that Fuller's Lake is part of a natural water course. He also testified that the waters passed through a gap on the north side of adja-

cent Section 31 and that there was no flow channel that was indicated by the scouring of the water. The state introduced a township plat certified to by the Surveyor General on March 1, 1880. This plat shows Fuller's Lake to be largely surrounded on both the north and south by bogs or marshes. The plat shows no outlet channel. This leads to the inference that no creek flowed out of Fuller's Lake and that when it became full the overflow waters found their way into the south branch of the Goose River over the lowland to the north indicated on the plat as a marsh. The lake is not fed by springs. It is a depression filled by water from the runoff of surface waters created by rains and melting snow.

In Brignall v. Hannah, 34 ND 174, 157 NW 1042, it was pointed out that in this state there were no express constitutional or statutory declarations with reference to title acquired by a riparian patentee from the United States to the bed of an adjacent non-navigable lake. The riparian owner's title was therefore determined by the common law. In paragraph 6 of the syllabus the common law rule is stated thus, "The owners of land abutting upon a meandered non-navigable lake own the lake bed in severalty, their respective titles extending to the center of the lake."

The principle of common law thus stated is supported by abundant authority. Hardin v. Jordan, 140 US 371, 838, 35 L ed 428, 11 S Ct 808; Linthicum v. Shipley, 140 Md 96, 116 A 871, 23 ALR 754, and annotation. Hillebrand v. Knapp, 65 SD 414, 274 NW 821, 112 ALR 1104, and annotations. In United States v. Oregon, 295 US 1, 79 L ed 1267, 55 S Ct 610, it is said, "Upon the admission of a State to the Union, the title of the United States to lands underlying navigable waters within the States passes to it, as incident to the transfer to the State of local sovereignty, and is subject only to the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce. But if the waters are not navigable in fact, the title of the United States to land underlying them remains unaffected by the creation of the new state."

In support of its contention that Fuller's Lake was at the time of the admission of the state to the Union and now is, navigable in fact, it relies strongly and quotes extensively from Roberts v. Taylor, 47 ND 146, 181 NW 622. Emphasis is laid upon this statement in the opinion. "A public use may not be confined entirely within a use for trade purposes alone. A use, public in its character, may exist when the waters may be used for the convenience and enjoyment of the public, whether traveling upon trade purposes or pleasure purposes. There is a growing recognition that the utilities of nature, so far as public use are concerned, are not always to be measured by the sign of the dollar. Purposes of pleasure, public convenience, and enjoyment may be public as well as purposes of trade. Navigation may as surely exist in the former as in the latter."

This quotation may imply some expansion of the rules of common law, but the implications of expansion, when considered in the light of the facts then before the court, do not cover Fuller's Lake. Roberts v. Taylor involved Sweetwater Lake which both at the time of the survey and time of the trial was a large lake with a vast expanse of water extending many miles to the north and south and extensive in width. It contained both clear and apparently deep water, and was used for hunting and for boating by the public. It was not a pond or marsh. Fuller's Lake is a small, marshy, body of water. Due to the artificial damming of the overflow it is more extensive now than it was at the time of the original survey. This is indicated by the fact that the water now extends beyond the meander lines in most directions. It is located in a well settled portion of the state. It is accessible from a public highway. Despite these circumstances the only evidence of its use by the public in recent years is for hunting. With reference to this use the evidence is meager. No instance has been called to our attention where a court has held a similar body of water to be navigable in fact, and our own search has disclosed none.

In support of its claim to the title to the bed of the lake, the state cites this provision of the North Dakota Constitution, Section 210, "All flowing streams and natural water courses shall

forever remain the property of the state for mining, irrigating and manufacturing purposes."

It is argued that Fuller's Lake is a part of a natural water course and the trial court so found. We deem the evidence on this point to be inconclusive. Many courts have defined the term "water course". See Words and Phrases, Vol. 44, page 724. These definitions disclose a lack of uniformity which is chiefly due to divergent facts and purposes to which the definitions were applied.

The Restatement of the Law, Torts, § 841, in a chapter on "Interference With Use of Water" provides this description of a watercourse.

"1. The term 'watercourse', as used in the Restatement of this Subject, comprehends a stream of water and its channel, both of natural origin, where the stream flows constantly or recurrently on the surface of the earth in a reasonably definite channel.

"2. The term 'watercourse' also comprehends springs, lakes or marshes in which such a stream originates or through which it flows."

If we should assume the correctness of this comprehensive definition and its applicability to Fuller's Lake, it would not sustain the state's claim to title to the bed of the lake.

Section 210 of the Constitution does not purport to vest in the state absolute ownership of flowing streams and water-courses, including title to the beds. It contemplates a limited property right for the purposes of mining, irrigating and manufacturing. The construction of Section 210 is foreshadowed by the following statement in Bigelow v. Draper, 6 ND 152, 69 NW 570.

"We feel constrained to hold, despite its broad language, that Section 210 was not framed to divest the rights of riparian owners in the waters and bed of all natural water courses in the state.

"On the other hand, we do not wish to be understood as expressing such a view as to its proper interpretation as would utterly emasculate it. So far as it can have constitutional ef-

fect, it should be construed as placing the integrity of our water courses beyond the control of individual owners. Should all the riparian proprietors along the course of a stream so join in the sale of their riparian rights as to work an utter destruction of the stream so far as its channel was within the bounds of this state, it might be that the sovereignty of the state could invoke this provision of the constitution against such attempted annihilation of the water course."

See also State ex rel. Trimble v. Minneapolis, St. Paul & Saulte Ste. Marie Railway Company, 28 ND 621, 150 NW 463. Fuller's Lake is not a navigable body of water. Section 210 of the North Dakota Constitution does not vest title to the lake bed in the State of North Dakota nor reserve to the state any right therein for the purpose of establishing a wildlife refuge. The court erred in determining that the state owned the bed of Fuller's Lake lying within the meander line. Both the complaint and judgment are based upon this erroneous premise. The state seeks to obtain title to the surrounding land by eminent domain. The error with respect to title to the bed of the lake is fatal to this proceeding. The judgment appealed from is reversed.

NUESSLE, Ch. J., BURKE, and CHRISTIANSON, JJ., and GRIMSON, District Judge, concur.

BURR, J., did not participate.