2013 ND 253

Stanford A. REEP and Amy Reep, the Stockman Family Trust, the Charles and Ruth Patch Trust, Heidi Mcgillivray, Julie Streich, Mary Beth Ferguson, Florence Irwin ex rel. Loren Irwin, her guardian and conservator, and Loren Irwin, Individually, Thomas Selby, and Sogard Davidson Mineral LLLP, and on Behalf of All Others Similarly Situated, Plaintiffs and Appellants

v.

STATE of North Dakota, North Dakota Board of University and School Lands; and North Dakota Trust Lands Commissioner Lance D. Gaebe, in his official and personal capacities, Defendants and Appellees.

Brigham Oil & Gas, L.P. n/k/a/ Statoil Oil & Gas L.P., Plaintiff and Appellee

v.

North Dakota Board of University & School Lands; City of Williston; Williams County, North Dakota; Geraldine Loder; Virgil A. Bloechl; Theresa Sitzmann; Michaele M. Gran; Robert James McDonald; Richard R. McDonald; Mary Ellen Smith; Carole J. McDonald; Thomas T. McDonald; Rose Marie Dokken; Elaine McDonald; John C. McDonald, Jr.; Josephine Swenson; Jacque N. Masog; Kay L. Dodge; William R. Mueller; Elvira C. Fulton; Doreen Fern McDonald; Goergia Carol Hausauer; Margaret Cecelia Gott; Marlyne Myrtle Loomis; Lesley Louise Neary; Virginia A. Venti; Eileen Eugenia Ehrler; BNSF Railway Company; Joseph Patrick Wodnik and Loraine Ann Wodnik, as joint tenants; Sherrill Myers; Viola DeTienne; Theresa Cogswell; Beulah Clawson; Norman Bratcher; Nancy Ann Bower–Pryor; Brian Jay Bower and Thomas Adrian Bower, as joint tenants; Stephen A. Messenger; Sandra Lee Messenger; Jacqueline Mech; Orville M. Erickson; Kerry P. Hoffman; Ardean O. Aafedt; Robert K. Torgerson; Jerome Bakke; Curtis Bakke; Sherrie Dee Bakke, Trustee of the Lowell G. Bakken Mineral Trust; Cynthia Jo Weldon; Jane Sanders Galt; Leah Pearce Bond; Charles E. Pearce and Gabriele Pearce as joint tenants; B.C. Harris and Ann Harris, Co–Trustees of the Harris Revocable Trust executed July 25, 1996; James R. Goins; Wayne Smith; Michael Brooks; Bill Como; Christi Breithaupt; Chris Smith; Kelly Smith; Mark Lemley; Beverly Sundet; Ricky Vance; Linda Kirkland; First National Bank and Trust Co. of Williston, Trustee of Hilda Noe Grandchildren Trust; Lois C. Zeigler, Trustee under the Last Will and Testament of Frederick H. Zeigler, Deceased; Shirley L. Schwab Trustee under Trust Agreement dated March 5, 1999; Gary S. Schwab; American State Bank & Trust Company of Williston, Trustee of Frank W. Moran and Mary Joan Moran Family Minerals Trust; American State Bank and Trust Company of Williston, Trustee of the Harris and Louise Anderson Family Minerals Trust U/A dated February 10, 2006; United States of America; Leroy Clapper; Energy One, LLC; Powers Energy Corporation; GeoFocus Corporation; Golden Eye Resources, LLC; Golden Eye Royalties, LLC; Upstream Innovations, Inc.; The Dublin Company; Petroleum Land Services; Huston Energy Corporation; Harvest Oil Company, LLC; and all unknown persons claiming an interest in, or lien or en-

cumbrance upon, the proceeds from the production of the mineral estate described in the complaint herein, Defendants

Kerry Hoffman, City of Williston, Williams County, North Dakota, Harvest Oil Company LLC, Beverly Sundet, Ricky Vance, Linda Kirkland, First National Bank & Trust Co. of Williston, Trustee of the Hilda Noe Grandchildren Trust, American State Bank and Trust Company of Williston, Trustee of the Frank W. Moran and Mary Joan Moran Family Minerals Trust, American State Bank and Trust Company of Williston, Trustee of the Harris and Louise Anderson Family Minerals Trust U/A dated February 10, 2006, Upstream Innovations, Inc., Shirley L. Schwab Trustee under Trust Agreement dated March 5, 1999, Lois C. Zeigler, Trustee under the Last Will and Testament of Frederick H. Zeigler, Deceased, and Gary S. Schwab, Jerome Bakke; Curtis Bakke; Sherrie Dee Bakke, Trustee of the Lowell G. Bakken Mineral Trust, Appellants

State of North Dakota, North Dakota Board of University and School Lands; and North Dakota Trust Lands Commissioner Lance D. Gaebe, in his official and personal capacities, Appellees.

Nos. 20130110, 20130111.

Supreme Court of North Dakota.

Dec. 26, 2013.

Rehearing Denied Feb. 24, 2014.

Jan M. Conlin (argued), Richard B. Allyn (appeared), Aaron R. Fahrenkrog (appeared), Sara A. Poulos (on brief), Minneapolis, MN, David R. Bossart (appeared), Thomas J. Conlin (appeared), Minneapolis, MN, Charles L. Neff (appeared), Williston, N.D. and John W. Morrison, Jr. (appeared), Bismarck, N.D., for plaintiffs and appellants. Stanford A. Reep and Amy Reep, the Stockman Family Trust, the Charles and Ruth Patch Trust, Florence Irwin ex rel. Loren Irwin, her guardian and conservator, and Loren Irwin, Individually, Thomas Selby, and Sogard Davidson Mineral LLLP, and on Behalf of All Others Similarly Situated.

Charles L. Neff (appeared), Williston, N.D., and Sara A. Poulos (on brief), Minneapolis, MN, for plaintiffs and appellants Heidi Mcgillivray, Julie Streich, Mary Beth Ferguson, Thomas Selby, and Sogard Davidson Mineral LLLP, and on Behalf of All Others Similarly Situated.

Charles M. Carvell (argued), Bismarck, N.D., Hope L. Hogan (appeared), Bismarck, N.D., Jennifer L. Verleger (appeared) and Thomas L. Trenbeath (appeared), Bismarck, N.D., for defendants and appellees State of North Dakota, North Dakota Board of University and School Lands; and North Dakota Trust Lands Commissioner Lance D. Gaebe, in his official and personal capacities.

Lawrence Bender (appeared) and Michael D. Schoepf (on brief), Bismarck, N.D., for plaintiff and appellee Brigham Oil & Gas, L.P. n/k/a Statoil Oil & Gas L.P.

Jan M. Conlin (argued), Richard B. Allyn (appeared), Aaron R. Fahrenkrog (appeared), Sara A. Poulos (on brief), Minneapolis, MN, and Charles L. Neff (appeared), Williston, N.D., for appellant Kerry Hoffman.

Kent A. Reierson (on brief), Williston, N.D., for appellant City of Williston, North Dakota.

Marlyce A. Wilder (on brief), Williston, N.D., for appellant Williams County, North Dakota.

Randall T. Cox (appeared), Gillette, WY, for appellant Harvest Oil Company, LLC.

Greg W. Hennessy (on brief), Williston, ND, for appellants Beverly Sundet, Ricky Vance, and Linda Kirkland.

Scott M. Knudsvig (appeared), Minot, N.D., for appellants First National Bank & Trust Co. of Williston, Trustee of the Hilda Noe Grandchildren Trust, American State

Bank and Trust Company of Williston, Trustee of the Frank W. Moran and Mary Joan Moran Family Minerals Trust, American State Bank and Trust Company of Williston, Trustee of the Harris and Louise Anderson Family Minerals Trust U/A dated February 10, 2006.

Dennis E. Johnson (on brief), Watford City, N.D., for appellant Upstream Innovations, Inc.

Shirley L. Schwab (on brief) Trustee under Trust Agreement dated March 5, 1999, 805 West Fairmont Drive, Peoria, IL, appellant.

Lois C. Zeigler (on brief), Trustee under the Last Will and Testament of Frederick H. Ziegler, Deceased, East Peoria, IL, appellant.

Gary S. Schwab (on brief), Springfield, IL, appellant.

Jerome Bakke (appeared), Grand Forks, N.D., appellant.

Curtis Bakke (on brief) and Sherrie Dee Bakke, (on brief) Trustee of the Lowell G. Bakken Mineral Trust, Sandy, UT, appellants.

SANDSTROM, Justice.

[¶ 1] Several owners of land next to navigable waters in North Dakota appeal from summary judgments determining the State owns the mineral interests under the land in the shore zone, the area between the ordinary high and low watermarks of the navigable waters. We conclude that the State owned the mineral interests under the shore zone of navigable waters upon statehood in 1889 under the equal footing doctrine and that the enduring language of the anti-gift clause now found in N.D. Const. art. X, § 18, precludes construing the language now codified in N.D.C.C. § 47–01–15 as a gift of the State's mineral interests under the shore zone to the upland owners. Thus, owner-ship of mineral interests under the shore zone may be different for individual upland owners. If the chain of title reflects the State granted its equal footing interests to upland owners, those upland owners take to the low watermark, subject to the public trust doctrine and except where the deed provides otherwise. If the State is not in the chain of title for the upland owner's property, the anti-gift clause precludes construing N.D.C.C. § 47–01–15 as a gift of the State's equal footing interests to upland owners. We affirm but our decision does not preclude an upland owner from taking to the low watermark if the chain of title establishes the State has granted its equal footing interest to an upland owner.

I

[¶ 2] Eleven named owners of land next to navigable waters in North Dakota ("Reep upland owners") sued the State, the North Dakota Board of University and School Lands, and the North Dakota Trust Lands Commissioner ("State"), seeking a declaration the Reep upland owners own the mineral interests under the shore zone of the navigable waters. In a separate action, well operator Brigham Oil and Gas, now known as Statoil Oil & Gas, named several upland owners as defendants in an interpleader action to determine adverse claims to proceeds from mineral interests under the shore zone of navigable waters in North Dakota. The actions were consolidated in the district court to determine the parties' rights to the mineral interests under the shore zone. On cross-motions for partial summary judgment, the court granted the State partial summary judgment, concluding that "it is the State of North Dakota—as part of its title to the beds of navigable waterways—that owns the minerals in the [shore zone] and that this public title excludes ownership and

any proprietary interest by riparian land-owners."

[¶ 3] In the Reep upland owners' action, the parties stipulated the partial summary judgment resolved the issues raised in the pleadings but did not delineate the ordinary high watermark for any parcel of land and agreed a final judgment would not preclude contesting the location of the ordinary high watermark in any separate proceeding. A final judgment was entered, and the Reep upland owners appealed. In the interpleader action, the district court entered a certification under N.D.R.Civ.P. 54(b) for immediate appeal. A final judgment was entered, and several interpleaded upland owners appealed. The appeals have been consolidated.

[¶ 4] The district court had jurisdiction under N.D. Const art. VI, § 8, and N.D.C.C. §§ 27–05–06 and 32–23–01. The appeals are timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 28–27–01 and N.D.R.Civ.P. 54(b).

## II

[¶ 5] The district court decided these cases by summary judgment, which " 'is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law.' " *Schmitt v. Merit-Care Health Sys.*, 2013 ND 136, ¶ 7, 834 N.W.2d 627 (quoting *Wenco v. EOG Res., Inc.*, 2012 ND 219, ¶ 8, 822 N.W.2d 701).

1. 1877 Revised Codes Territory of Dakota, Civil Code § 266, provided:

## III

[¶ 6] The upland owners argue the district court erred in deciding the State owns the mineral interests under the shore zone. They argue the court's decision is contrary to this Court's decision in *State ex rel. Sprynczynatyk v. Mills*, 523 N.W.2d 537, 542–43 (N.D.1994), which they claim held that upland owners next to navigable waters have "full interests" in the shore zone under N.D.C.C. § 47–01–15, subject to the State's obligation to protect the public's right to use the navigable waters. The upland owners assert the State's public trust and equal footing obligations relate to the public's use of waters for "navigating, boating, fishing, fowling and like public uses" and do not relate to the proprietary privileges of ownership of subsurface mineral interests under the shore zone. They claim *Mills* resolved the constitutionality of N.D.C.C. § 47–01–15 and the statute does not violate the anti-gift clause in N.D. Const. art. X, § 18.

[¶ 7] The State responds that its title to the beds of navigable waters continues to extend, as it did at the moment of statehood, from high watermark to high watermark under the equal footing doctrine. The State argues N.D.C.C. § 47–01–15 does not convey or grant public resources; rather, the statute is a rule of construction for conveyances of riparian land and clarifies the extent of a grantor's conveyance to the grantee except when the grant under which the land is held indicates a different intent. The State argues the equal footing doctrine and the anti-gift clause prohibit construing N.D.C.C. § 47–01–15 as a State grant of the mineral interests under the shore zone to private entities.

[¶ 8] Section 47–01–15, N.D.C.C.,[1] provides:

Except where the grant under which the land is held indicates a different intent, the owner of the upland when it borders upon a

Except when the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on a navigable lake or stream, takes to the edge of the lake or stream at low watermark. All navigable rivers shall remain and be deemed public highways. In all cases when the opposite banks of any stream not navigable belong to different persons, the stream and the bed thereof shall become common to both.

[¶ 9] In *Mills*, 523 N.W.2d at 540–43, this Court considered the interest that an upland owner "takes" to the low watermark of navigable waters under N.D.C.C. § 47–01–15. In that case, the State claimed it held title to the shore zone to the ordinary high watermark under the equal footing and public trust doctrines, and upland owners claimed the statute granted them absolute title of the shore zone to the low watermark, subject to the State's navigational servitude to the high watermark. *Mills*, at 538. This Court described the historical basis of ownership of the shore zone next to navigable waters in North Dakota:

Before North Dakota was admitted to the Union, the United States held the beds of navigable waters in the Dakota Territory from high watermark to high watermark in trust for the future state. *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); *Oregon v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977); *J.P. Furlong Enterprises, Inc. v. Sun Exploration & Production*

*Co.*, 423 N.W.2d 130 (N.D.1988). Upon admission to the Union, North Dakota was entitled to sovereign ownership of the beds of navigable waters from high watermark to high watermark under the equal footing doctrine. *Oregon v. Corvallis Sand & Gravel Co.*, supra; *Barney v. Keokuk*, 94 U.S. 324, 24 L.Ed. 224 (1876); *Pollard's Lessee v. Hagan*, 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845). Upon entering the Union on equal footing with the established States, the "rights of riparian or littoral proprietors in the soil below high water mark of navigable waters [were] governed by the local laws." *Shively v. Bowlby*, 152 U.S. 1, 40, 14 S.Ct. 548, 563, 38 L.Ed. 331 (1894). *See Montana v. United States*, supra; *Oregon v. Corvallis Sand & Gravel Co.*, supra; *Barney v. Keokuk*, supra; *Shively v. Bowlby*, supra; *J.P. Furlong*, supra. Under those principles, North Dakota could "resign to the riparian proprietor rights which properly belong to [it] in [its] sovereign capacity," and was free to allocate property interests in the beds of navigable waters below the ordinary high watermark. *Barney v. Keokuk*, supra, 94 U.S. at 338. *See* N.D.C.C. § 47–01–14. However, North Dakota could not totally abdicate its interest to private parties because it held that interest, by virtue of its sovereignty, in trust for the public. *Illinois Central Railroad v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892); *United Plainsmen Ass'n v. North Dako-*

---

navigable lake or stream, takes to the edge of the lake or stream at low-water mark, and all navigable rivers shall remain and be deemed public highways. In all cases where the opposite banks of any streams, not navigable, belong to different persons, the stream and the bed thereof shall become common to both.

The transition schedule for North Dakota's 1889 constitution provided that "[a]ll laws

now in force in the territory of Dakota, which are not repugnant to this Constitution shall remain in force until they expire by their own limitations or be altered or repealed." 1889 N.D. Const. Transition Schedule § 2. Except for minor stylistic changes, the language in § 266 from the 1877 territorial provision was codified in 1895 Revised Codes of North Dakota, § 3373.

*ta State Water Conservation Commission,* 247 N.W.2d 457 (N.D.1976).

*Mills,* 523 N.W.2d at 539–40.

[¶ 10] In construing the word "takes" in N.D.C.C. § 47–01–15 and analyzing the competing interests of the State and an upland owner in the shore zone, this Court explained that "[a]ny statements in our prior decisions that 'the owner of lands riparian to a navigable stream owns title to the low water mark' are dicta." *Mills,* 523 N.W.2d at 540. This Court said the word "takes" in that statute was ambiguous and construed the statutory language as a rule of construction for determining the boundary for grants of land next to navigable waters in conjunction with *Champlain & St. Lawrence R. Co. v. Valentine,* 19 Barb. 484 (N.Y.Sup.1853), and other contemporaneous statutory language using the term "own" or "ownership":

> The specific terms employed in the territorial statutes and the definition of "ownership" have continuously remained as statutory provisions in North Dakota, and evidence a legislative intent that "takes" was not intended as a self-executing grant of absolute "ownership" to the low watermark.
>
> We believe the decision in *Champlain* and the different terms in those enduring statutes, coupled with the introductory clause in N.D.C.C. § 47–01–15 which focuses on "the grant under which the [riparian] land is held," as a whole, evidence a legislative intent that that statute did not grant a riparian landowner absolute ownership of the shore zone. We agree with the district court that N.D.C.C. § 47–01–15 is a rule of construction for determining the boundary for grants of riparian land and is not itself an absolute grant of ownership to the low watermark. As a rule for interpreting conveyances, a riparian grantee "takes" the interest that is granted in

the conveying instrument to the low watermark, which is the boundary of the grantee's interest. We construe N.D.C.C. § 47–01–15 in that manner to avoid an interpretation that would grant a private party a gift in violation of the anti-gift clause of our state constitution, N.D. Const. Art. X, § 18. *See Solberg v. State Treasurer,* 78 N.D. 806, 53 N.W.2d 49 (1952); *Herr v. Rudolf,* 75 N.D. 91, 25 N.W.2d 916 (1947).

> With this interpretation, we conclude that, absent a contrary intent, the "grant under which the [riparian] land is held" includes a riparian grantee's full interest in the shore zone, and necessarily precludes the State's claim of absolute ownership to the high watermark. However, the equal footing and public trust doctrines establish that the State cannot totally abdicate its interest to the high watermark, and that a riparian landowner's interest to the low watermark is not absolute. *Illinois Central Railroad* [146 U.S. 387, 13 S.Ct. 110 (1892) ]; *United Plainsmen Ass'n,* [247 N.W.2d 457 (N.D.1976) ]. *See also* N.D. Const. Art. XI, § 3; Note, *The Public Trust Doctrine in North Dakota,* 54 N.D.L.Rev. 565 (1977–78).

*Mills,* 523 N.W.2d at 542–43 (footnotes omitted).

[¶ 11] This Court construed N.D.C.C. § 47–01–15 as a rule of construction rather than as a self-executing grant of absolute ownership of land to the low watermark to avoid an interpretation that would grant a private party a gift in violation of the anti-gift clause in N.D. Const. art. X, § 18. *Mills,* 523 N.W.2d at 542–43 n. 6. This Court said N.D.C.C. § 47–01–15 did not grant an upland owner or the State absolute ownership of the shore zone and emphasized neither party's interest in the shore zone was absolute. *Mills,* at 542–43. Because no specific right or claim for use

of the shore zone was raised in *Mills,* this Court followed the "well established [principle] that courts will not give advisory opinions if there is no actual controversy to be determined" and "decline[d] to speculate on the precise extent of the parties' rights and interests vis-a-vis the shore zone." *Id.* at 544.

[¶ 12] The upland owners' reliance on language in *Mills,* 523 N.W.2d at 543, about a riparian grantee receiving a "full interest" in the shore zone to support their argument that they own the mineral interests under the shore zone is misplaced. In the context of the narrow holding in *Mills,* at 544, that statement refers to full interest the grantee receives from the grantor unless the grant provides otherwise and is not so broad as to include interests the grantor did not have. *Mills* stands for the proposition there is not absolute ownership of the shore zone, and because no specific right or claim for use of the shore zone was raised in that case, this Court declined to expound on hypothetical interests or claims. 523 N.W.2d at 544. To the extent the upland owners claim they have "full interests" in the shore zone, including mineral interests, they overstate this Court's decision in *Mills.*

[¶ 13] The specific property interest at issue in this case involves the parties' claims to mineral interests under the shore zone.

■ [¶ 14] The United States Supreme Court has recognized the equal footing doctrine is constitutionally based under an unbroken line of cases explaining that, upon entering the union on equal footing with established States, a newly-admitted State receives absolute title to beds of navigable waters within the State's boundaries from high watermark to high watermark. *See PPL Montana, LLC v. Montana,* ── U.S. ──, 132 S.Ct. 1215, 1226–29, 182 L.Ed.2d 77 (2012); *Montana v.*

*United States,* 450 U.S. 544, 551, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); *Oregon v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 372–78, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977); *Pollard v. Hagan,* 44 U.S. 212, 222–23, 3 How. 212, 11 L.Ed. 565 (1845). *See also Mills,* 523 N.W.2d at 539. In *PPL Montana,* at 1227 (quoting *Corvallis Sand & Gravel,* at 374, 97 S.Ct. 582), the United States Supreme Court explained that under the equal footing doctrine, "a State's title to these lands [under navigable waters] was 'conferred not by Congress but by the Constitution itself.'" As we explained in *Mills,* 523 N.W.2d at 539, "[b]efore North Dakota was admitted to the Union, the United States held the beds of navigable waters in the Dakota Territory from high watermark to high watermark in trust for the future state." Under the constitutionally moored equal footing doctrine, the upland owners recognize that when "North Dakota joined the Union in 1889 . . . [it] took title to the beds of the Missouri River under the equal footing doctrine up to the ordinary high watermark on each bank, including the shore zone."

[¶ 15] After admission to the Union, a newly-admitted State, including North Dakota in 1889, was free to "allocate and govern those [shore zone] lands according to state law subject only to 'the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce.'" *PPL Montana,* 132 S.Ct. at 1228 (quoting *United States v. Oregon,* 295 U.S. 1, 14, 55 S.Ct. 610, 79 L.Ed. 1267 (1935)). *See Mills,* 523 N.W.2d at 539–40. As we also explained in *Mills,* however, "North Dakota could not totally abdicate its interest [in the shore zone] to private parties because it held that interest, by virtue of its sovereignty, in trust for the public." 523 N.W.2d at 540 (citing *Illinois Cent. R. Co.*

*v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892); *United Plainsmen Ass'n v. North Dakota State Water Conservation Comm'n*, 247 N.W.2d 457 (N.D. 1976)).

[¶ 16] After admission to the Union, some States have allocated ownership of the shore zone to the upland owner to the ordinary low watermark, subject to the public trust doctrine. *See State v. Superior Court*, 29 Cal.3d 210, 172 Cal.Rptr. 696, 625 P.2d 239, 247–48 (1981) (holding long-standing administrative interpretation that statutory provision constitutes grant to private persons of title to beds of navigable waters to low watermark, subject to public trust); *City of Long Beach v. Marshall*, 11 Cal.2d 609, 82 P.2d 362, 364–65 (1938) (recognizing that upon statehood, the State became owner of tidelands, including minerals, subject to public trusts for navigation, commerce, and fishing; the State has power to grant those lands to municipalities, subject to those trusts); *State ex rel. Buckson v. Pennsylvania R. Co.*, 267 A.2d 455, 458–59 (Del.1969) (noting longstanding settled rule of property in Delaware establishes riparian owner of land next to navigable water holds title to low watermark); *State v. Korrer*, 127 Minn. 60, 148 N.W. 617, 621 (1914) (established Minnesota law gives upland owner title to property abutting navigable water to low watermark); *Gibson v. Kelly*, 15 Mont. 417, 39 P. 517, 519–20 (1895) (recognizing some States hold that upland owner's abutting title goes to high watermark and other States hold that title goes to low watermark; adopting rule that upland owner's title goes to low watermark); *Conran v. Girvin*, 341 S.W.2d 75, 80 (Mo.1960) (recognizing Missouri has elected to resign to the riparian proprietor title to the shore of navigable streams to low watermark); *Flisrand v. Madson*, 35 S.D. 457, 152 N.W. 796, 800–01 (1915) (riparian owner has title

to edge of navigable water at low watermark).

[¶ 17] Some States, however, have decided an upland owner's title extends only to the ordinary high watermark. *See Alaska v. Pankratz*, 538 P.2d 984, 988 (Alaska 1975) (acknowledging that parties agreed that State has title to beds of navigable waters up to ordinary high watermark); *Anderson v. Reames*, 204 Ark. 216, 161 S.W.2d 957, 959 (1942) (riparian owners have use and control of their land to high watermark); *Martin v. Busch*, 93 Fla. 535, 112 So. 274, 283 (1927) (upon admission to Union, Florida became owner of land next to navigable water to ordinary high watermark, and unless lawfully conveyed or granted, still owns to the ordinary high watermark); *Gasman v. Wilcox*, 54 Idaho 700, 35 P.2d 265, 266 (1934) (upland proprietor's property title extends only to ordinary high watermark); *Siler v. Dreyer*, 183 Kan. 419, 327 P.2d 1031, 1034 (1958) (boundary between landowner and State's navigable river bed is line to which water rises in times of ordinary highwater); *Gibson*, 39 P. at 519 (discussing split of authority regarding upland owner's title to either high or low watermark); *Provo City v. Jacobson*, 111 Utah 68, 181 P.2d 213, 214 (1947) (boundary between State land and privately owned land next to navigable water is high watermark).

[¶ 18] Here the State argues it owned the mineral interests under the shore zone to the ordinary high watermark under the equal footing doctrine at the moment of statehood in 1889 and its ownership was thereafter governed by State law, including the anti-gift clause of N.D. Const. art. X, § 18, which the State asserts precludes it from allocating or gifting its mineral interests under the shore zone to an upland owner under the language of N.D.C.C. § 47–01–15.

[¶ 19] In *Mills,* 523 N.W.2d at 542–43 n. 6, this Court explicitly construed N.D.C.C. § 47–01–15 as a rule of construction rather than as a self-executing grant of absolute ownership of land to the low watermark to avoid an interpretation that would grant a gift to a private party in violation of the anti-gift clause of N.D. Const. art. X, § 18, which currently provides: [2]

> The state, any county or city may make internal improvements and may engage in any industry, enterprise or business, not prohibited by article XX of the constitution, but neither the state nor any political subdivision thereof shall otherwise loan or give its credit or make donations to or in aid of any individual, association or corporation except for reasonable support of the poor, nor subscribe to or become the owner of capital stock in any association or corporation.

[¶ 20] In *Haugland v. City of Bismarck,* 2012 ND 123, ¶¶ 22–40, 818 N.W.2d 660, we extensively discussed the historical development of the anti-gift clause from its adoption by the people in North Dakota's first constitution in 1889. *Haugland* involved a claim that tax increment financing for urban renewal projects under N.D.C.C. ch. 40–58 constituted a gift of tax money to private property owners. 2012 ND 123, ¶ 1, 818 N.W.2d 660. We recognized the anti-gift clause did not initially include language authorizing the State or a political subdivision to "engage in any industry, enterprise or business" and explained the "people originally adopted [the anti-gift clause] to prohibit the State or a political subdivision from making donations or giving or loaning credit to aid in the construction of railroads or other internal improvements." *Haugland,* at ¶¶ 27–28. We discussed the people's adoption of the language authorizing the State or a political subdivision to engage in any industry, enterprise or business, and we held the urban renewal provisions of N.D.C.C. ch. 40–58 satisfied a public purpose for a municipality to engage in an "enterprise" and did not violate N.D. Const. art. X, § 18. *Haugland,* at ¶¶ 28, 40. In reaching that conclusion, we rejected the plaintiff's reliance on the Arizona Supreme Court's decision in *Turken v. Gordon,* 223 Ariz. 342, 224 P.3d 158, 161 (2010), because Arizona's constitutional provision precluding political subdivisions from making gifts did not authorize a municipality to engage in an enterprise and to otherwise loan money or give its credit or make donations in furtherance of that enterprise. *Haugland,* at ¶ 36. We therefore concluded *Turken* was not persuasive for evaluating the urban renewal statutes under N.D. Const. art. X, § 18. *Haugland,* at ¶ 36.

[¶ 21] This case, however, does not involve an issue about the State or a political subdivision engaging in an industry, enterprise, or business. Rather, it involves claims for ownership of mineral interests under N.D.C.C. § 47–01–15 against the backdrop of the anti-gift clause.

[¶ 22] In *Arizona Ctr. for Law v. Hassell,* 172 Ariz. 356, 837 P.2d 158, 172–73 (App.1991), the Arizona Court of Appeals held a statute that substantially relinquished Arizona's equal footing interest in

---

**2.** As originally adopted by the people of North Dakota in 1889, the anti-gift clause provided:

> Neither the State nor any county, city, township, town, school district or any other political subdivision shall loan or give its credit or make donations to or in aid of any individual, association or corporation, ex-

cept for necessary support of the poor, nor subscribe to or become the owner of the capital stock of any association or corporation, nor shall the State engage in any work of internal improvement unless authorized by a two-thirds vote of the people.

N.D. Const. art. XII, § 185 (1889).

navigable riverbeds constituted a gift to riparian landowners without adequate consideration. In *Hassell*, the court explained that in 1985, Arizona officials began asserting State ownership of land under beds of watercourses navigable when Arizona was admitted to the Union in 1912. 837 P.2d at 161–62. After the Arizona Legislature enacted 1987 legislation substantially relinquishing the State's equal footing interest in the riverbeds to resolve clouds to title in the riverbeds, several plaintiffs sued various State entities, claiming the statute violated the gift clause of the Arizona constitution, Ariz. Const. art. IX, § 7, and the State's sovereign duty to protect public trust land. 837 P.2d at 162–63. In *Hassell*, the trial court concluded the "state could legally relinquish its claims to the riverbeds for the purpose of 'unclouding title.'" *Id.* at 163. The Arizona Court of Appeals discussed Arizona's public trust doctrine and gift clause jurisprudence and said under the gift clause, a public purpose and fair consideration must be shown when a court reviews a dispensation of public trust property. *Id.* at 169–71. The court held the statutory provisions substantially relinquishing Arizona's equal footing interest in navigable riverbeds violated Arizona's gift clause. *Id.* at 168–73. *See also Defenders of Wildlife v. Hull,* 199 Ariz. 411, 18 P.3d 722, 738–39 (App.2001) (holding statute disclaiming State's interest in waterbeds based on preempted standards for determining navigability violated Arizona's gift clause).

[¶ 23] In *Solberg v. State Treasurer,* 78 N.D. 806, 809–10, 53 N.W.2d 49, 50–51 (1952), this Court considered a statute directing the State to release a reserved mineral interest to a prior owner. In that case, in the late 1930s, an owner of land defaulted on a mortgage to the State, quitclaimed the property to the State, and then reacquired the property subject to the State's reservation of 50 percent of the minerals. *Id.* at 807–08, 53 N.W.2d at 49–50. In 1951, the legislature enacted a statute directing the State to release its reservation of minerals, and the prior owner asked the State Treasurer to release reserved minerals for the sum of ten cents per acre, despite the interest having a fair market value exceeding ten dollars per acre. *Id.* at 810, 53 N.W.2d at 51. The State Treasurer refused, claiming the 1951 statute violated the anti-gift clause. *Id.* This Court held the 1951 statute violated the anti-gift clause because the statute had the effect of transferring State property as a gift. *Id.* at 814–17, 53 N.W.2d at 53–55.

[¶ 24] This Court's decision in *Solberg* is similar to the rationale employed by the Arizona Court of Appeals in *Hassell* and militates in favor of determining the State's enactment of N.D.C.C. § 47–01–15 has not allocated or granted the State's equal footing mineral interests in the shore zone to upland owners. *Solberg* is particularly relevant to the interpretation and application of N.D.C.C. § 47–01–15 to mineral interests, because we cited *Solberg* in *Mills,* 523 N.W.2d at 542–43 (footnote omitted), when "[w]e construe[d] N.D.C.C. § 47–01–15 [as a rule of construction] to avoid an interpretation that would grant a private party a gift in violation of the anti-gift clause of . . . N.D. Const. Art. X, § 18." *See also Herr v. Rudolf,* 75 N.D. 91, 102–03, 25 N.W.2d 916, 922 (1947) (statutory provision that effectively gives person a donation from State violates anti-gift clause). As in *Mills,* at 542–43, we construe N.D.C.C. § 47–01–15 in a manner to avoid an interpretation that would grant a gift to an upland owner, or a predecessor in interest, in violation of the anti-gift clause language of N.D. Const. art. X, § 18. *See City of Bismarck v. Nassif,* 449 N.W.2d 789, 794 (N.D.1989) (courts construe statutes to harmonize provisions with constitution); N.D.C.C. § 1–

02–38(1) ("[i]n enacting a statute, it is presumed ... [c]ompliance with the constitutions of the state and of the United States is intended"). That interpretation is also consistent with the rule of construction that statutory enactments are presumed to favor a public interest over any private interest. N.D.C.C. § 1–02–39(5). We conclude N.D.C.C. § 47–01–15 does not convey or allocate the State's equal footing interest in minerals under the shore zone, which the State owned at the moment of statehood in 1889, to upland landowners on navigable waters in North Dakota. Under the rule of construction for determining boundaries in N.D.C.C. § 47–01–15, however, if the State contractually grants or conveys parts of its equal footing interests to upland owners by deed, subject to the restrictions of the public trust doctrine, and except when the deed provides otherwise, the grantee takes the State's full interest to the low watermark. *See Mills,* 523 N.W.2d at 542–44. As a rule of construction, upland owners receiving grants or conveyances from the State take to the low watermark under the language of N.D.C.C. § 47–01–15, subject to the restrictions of the public trust doctrine and except when the deed provides otherwise.

[¶ 25] The upland owners' reliance on cases cited in *Mills,* 523 N.W.2d at 543, is misplaced. *See State v. Superior Court,* 29 Cal.3d 210, 172 Cal.Rptr. 696, 625 P.2d 239 (1981); *State v. Korrer,* 127 Minn. 60, 148 N.W. 617 (1914); *Montana Coalition for Stream Access, Inc. v. Curran,* 210 Mont. 38, 682 P.2d 163 (1984); *Flisrand v. Madson,* 35 S.D. 457, 152 N.W. 796 (1915). This Court cited those cases to support the principle that the parties have correlative rights in the shore zone. *Mills,* at 543–44. Those cases and authorities from other low watermark states do not control the issue about ownership of mineral interests in the shore zone in North Dakota because they do not involve an analysis under an anti-gift clause like N.D. Const. art. X, § 18.

Moreover, although *Korrer,* 148 N.W. at 621, involved mining in the shore zone, the Minnesota Supreme Court's analysis also did not involve an anti-gift clause and that court said established Minnesota law recognized a riparian owner owns the land next to navigable waters to the low watermark. Because no specific property interest was contested in *Mills,* this Court cited cases from other jurisdictions to support the principle that the "shore zone presents a complex bundle of correlative, and sometimes conflicting, rights and claims which are better suited for determination as they arise." 523 N.W.2d at 544.

[¶ 26] We conclude the upland owners' reliance on N.D.C.C. § 47–01–15 to support their claim to mineral interests under the shore zone of navigable waters in North Dakota is misplaced and the landowners have not cited any other factual support to show a grant of mineral interests by the State, or a successor to the State, to any specific upland owner. We therefore conclude the district court did not err in concluding the State owns the mineral interests under the shore zone.

### IV

[¶ 27] We affirm the summary judgments, but our decision does not preclude an upland owner from taking to the low watermark if the chain of title establishes the State has granted its equal footing interest to an upland owner.

[¶ 28] GERALD W. VANDE WALLE, C.J., JAMES D. HOVEY, D.J., CAROL RONNING KAPSNER and MARY MUEHLEN MARING, JJ., concur.

[¶ 29] The Honorable JAMES D. HOVEY, D.J., sitting in place of CROTHERS, J., disqualified.